# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-01702-SCT

### *MISSISSIPPI VALLEY SILICA COMPANY, INC.*

*v.*

### *GWENDOLYN M. REEVES, INDIVIDUALLY AND AS WRONGFUL DEATH BENEFICIARY OF ROBERT B. REEVES, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES OF ROBERT B. REEVES, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/03/2012 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| TRIAL COURT ATTORNEYS: | ANDY LOWRY |
| | JOHN D. COSMICH |
| | MICHAEL D. SIMMONS |
| | LAKEYSHA GREER ISAAC |
| | ROBERT ALLEN SMITH, JR. |
| | TIMOTHY W. PORTER |
| | PATRICK MALOUF |
| | JOHN TIMOTHY GIVENS |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | ANDY LOWRY |
| | CHARLES G. COPELAND |
| | JOHN D. COSMICH |
| | MICHAEL D. SIMMONS |
| | LAKEYSHA GREER ISAAC |
| ATTORNEYS FOR APPELLEE: | DAVID NEIL MCCARTY |
| | ROBERT ALLEN SMITH, JR. |
| | TIMOTHY W. PORTER |
| | PATRICK MALOUF |
| | JOHN TIMOTHY GIVENS |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND RENDERED - 04/17/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., LAMAR AND KITCHENS, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Robert Reeves, a career employee of Illinois Central Railroad, sued Mississippi Valley Silica, Inc. (Valley) for lung injuries that allegedly were caused by his inhalation of silica (a component of sand) while employed with Illinois Central. The case was dismissed without prejudice in 2006, and the present suit was filed against thirty-two named defendants in the Circuit Court of the Second Judicial District of Jones County in 2007. Robert Reeves died in 2010, before the litigation was concluded, and the case then was pursued by his wrongful death beneficiaries. After trial in May 2012 against the sole remaining defendant, Valley, the jury found economic damages in the amount of $149,464.40 and noneconomic damages of $1.5 million, with Valley 15% at fault. The jury also awarded punitive damages of $50,000, and the trial court awarded attorney fees of $257,701.50. Although Valley was found only 15% at fault, the trial court determined that the law in place in 2002, when the original complaint was filed, should apply. Accordingly, the statutory caps on punitive and noneconomic damages enacted in 2004 were inapplicable and Valley was jointly and severally liable for 50% of the judgment. Ultimately, the court determined that Valley owed the Reeves beneficiaries $824,732.20, plus $50,000 in punitive damages, and $257,701.50 in attorney fees, for a total of $1,132,433.70. Valley appealed. We hold that the plaintiff failed to present sufficient evidence to identify Valley's sand as the proximate cause of Robert Reeves's injuries as a matter of law. Therefore, we reverse the judgment of the trial court and render judgment in favor of Mississippi Valley Silica.

## FACTS AND PROCEDURAL HISTORY

¶2.　　Robert B. Reeves (R.B.) was born in 1926 and worked as a brakeman, then as a conductor, for the Illinois Central Railroad from 1947 to 1991. In his capacity as a brakeman, he "had to break up the cars, switch with the switch engine, make up trains and deliver trains." While the train was in motion, he was required to keep his head out of the window to look for problems down the line. As a result, his face was exposed to "a lot of sand, cinders and everything." R.B. was exposed to sand and dust because sand was used for wheel traction in braking and to prevent locomotives' wheels from spinning when trains encountered grades steep enough to require its use. R.B. explained:

> You had an air brake, an air gauge on that engine. A big tank was filled up with sand, and the engineer mashed that brake, it would spray that rails to keep the train from slipping. In other words, it – I don't know whether people know how they spin anyway. But he pops that sand on there. Well, that sand blows up in his face, my face and everybody else's. And if you are switching boxcars, you are always right by that engine, where all that sand, everything else comes down on you.

¶3.　　R.B. explained that he was exposed to crushed sand and dust every day. When asked how often during the day sand was blown onto the tracks, he responded, "Continuously, in some cases. You either had a lot to pull, or you are going up an incline, or you had weight back there that you couldn't pull that goes to spinning, the sand – some engines now, it automatically goes on." He never wore any type of respiratory protection. Although later in his career he became a conductor, he stated that it was "all the same" in terms of the conditions for sand exposure. R.B. also worked for eight years at the railroad switchyard in the Masonite plant in Laurel, where he claimed he was exposed to asbestos as well as silica

3

from sandblasting. He smoked "a pack a day or better" of cigarettes for forty-two years until he had heart surgery in 1986, at which point he quit.

¶4.    R.B. married Gwendolyn Reeves (Reeves) in February 2002. She testified that he was in "pretty good health" when the two first married. In 2003, he began having some coughing problems, and he developed heart arrhythmia. In 2004, after increasing congestion and difficulty breathing, R.B. was diagnosed with fibrosis, or scarring of the lungs. By 2006, R.B. required the assistance of an oxygen tank to breathe adequately, and his condition gradually deteriorated over the next four years. By March 2010, he was constantly on oxygen and was confined to his home. In June 2010, his physicians informed him there was nothing more they could do, and he was told to get his affairs in order and try to stay as comfortable as possible. He died on August 1, 2010, of what his treating physician called interstitial pulmonary fibrosis. Essentially, his lungs had become scarred over time, contracting until he could not breathe enough oxygen to support his life.

¶5.    Prior to his serious decline in health, in 2002, R.B. and others filed a multiplaintiff case against numerous defendants in the Circuit Court of the Second Judicial District of Jones County, alleging that he was afflicted with silicosis, a lung disease "caused by exposure to respirable crystalline silica. . . ." In 2006, this Court handed down its decision in *Canadian National v. Smith, et al.*, 926 So. 2d 839, 845 (¶ 23) (Miss. 2006), in which it disallowed an improperly joined multiplaintiff action and permitted refiling of separate actions by individual plaintiffs. Accordingly, the multiplaintiff action in which R.B. was involved was dismissed without prejudice with instructions to refile the case in a proper venue pursuant to this Court's holding in *Canadian National*. In 2007, R.B. timely refiled

4

his case in the Circuit Court of the Second Judicial District of Jones County against thirty-two defendants, including Valley. After he died in 2010, his widow and wrongful death beneficiary Gwendolyn Reeves was substituted for R.B. and she filed an amended complaint materially similar to the original that had been filed by R.B. in 2007. The amended complaint sought wrongful death and survival damages.

¶6.     When trial finally commenced on May 29, 2012, Valley was the sole remaining defendant.[1] Reeves's position is that R.B.'s injuries and death were caused by mixed-dust pneumoconiosis (MDP)[2] due to his exposure to asbestos and silica. Because R.B. previously had filed a suit for asbestosis damages, in this case, Reeves, his widow, was seeking damages due only to "the silica component of the mixed-dust disease." The facts surrounding R.B.'s exposure to silica and his resulting illness are gleaned from the testimony of several witnesses, some who testified by video deposition and some who testified at trial. Reeves produced witnesses to testify about R.B.'s exposure to silica, Valley's failure properly to warn about the dangers of silica exposure, and how R.B.'s exposure to silica had caused silicosis and ultimately, his death. We address only the evidence adduced to prove that Valley sold the sand that allegedly injured and killed R.B.

¶7.     At trial, the then-deceased R.B. testified via video deposition about his routine and regular exposure to sand and dust that was sprayed onto tracks traversed by trains on which he worked for more than forty years, as well as his exposure to asbestos and silica at the

---

[1]Valley went out of business in 1978. This case is being defended by its insurer.

[2]This means that he had breathed in both asbestos dust and respirable silica and his illness was a result of his exposure to that mixture of dust.

Masonite plant in Jones County, where he had worked switching trains for eight years. R.B. testified that he specifically remembered using Valley bags of sand during a flood in Jackson in the 1970s. He seemed to be trying to say that Valley sand was used at other times and for other purposes, but he did not recount another specific instance of his having used Valley sand.[3] Additionally, on cross-examination, R.B. testified that he did not fill the large sand tanks on locomotives from which sand was sprayed onto the rails, and therefore, he rarely dealt with the actual sand bags from which such tanks were filled.

¶8.     A.J. Bohannon, who worked on the same crew with R.B. for more than thirty years, testified for Reeves. Bohannon testified about the conditions he and R.B. had faced when their job took them to the Masonite plant at Laurel, Mississippi.[4] He testified that, when the train went through the boiler room, the workers on the train would be exposed to sand dust and "excess waste stuff that comes out down there." Bohannon also testified about the conditions in the cab when sand was sprayed on the tracks to prevent wheel slippage. The sand cut on automatically when the train was in a "heavy pull," and with the "traction motors . . . pulling air through the cab of the engine," the sand would get sucked up into the cab where Bohannon and R.B. were located.  Bohannon also testified that the two were exposed to sandblasting three days a week in a Mobile, Alabama, switching yard. This exposure

---

[3]For example, when asked if a picture of a Valley bag of sand looked like what was used when he worked for the railroad, R.B. stated, "I'd say that's it." When asked if that sand had been used for a long period of time by the railroad, R.B. replied, "Yes. I would say that it was." However, he did not specifically identify a time other than the flood when he witnessed the sand being used.

[4]Frank Bogran, former president of Valley, specifically remembered selling sand to the Masonite plant. None of his testimony indicated that Valley sold to Illinois Central.

occurred throughout their entire careers. In the yard, R.B. and Bohannon could be anywhere from twenty-five feet to one hundred yards away from sandblasting activities. According to Bohannon, Valley sand was used for sandblasting at the switch yard, and it was used for traction sand by Illinois Central.

¶9.     Dr. Vernon Rose, a certified industrial hygienist, testified about the total amount of silica exposure to which R.B. was subjected over his career. He testified that traction sand is pulverized into fine dust when it is crushed between the wheels of a train and the track, and that sandblasting pulverizes sand particles in a similar way. According to Rose, both sandblasting and traction sand create respirable silica. Respirable silica consists of the microscopic sand particles[5] which actually get into persons' lungs and cause disease. After hearing the testimony of R.B. and Bohannon, Rose estimated that R.B. had been exposed to respirable silica for more than 1,500 hours during the course of his career, both in the form of traction sand and sandblasting exposure. This amounted to significant exposure, according to Rose. He also referenced several studies conducted after Valley went out of business which determined that railroad crews were exposed to substantial levels of total silica dust, although the amount of respirable silica to which they were exposed was not measured.

¶10.     Valley offered the testimony of Earl Gregory, a certified industrial hygienist, to counter the exposure testimony offered by Reeves. Gregory emphasized that the studies relied upon by Rose did not measure respirable silica, which undisputedly is the only type of silica that can cause damage to the lungs. He disputed the accuracy of the total dust

---

[5]They are less then ten micrometers, or $10^{-5}$ meters, in diameter, smaller than the width of a human hair.

measurements found in those studies, stating that the method of determining the amount and type of dust was wrong. He also testified that R.B.'s and Bohannon's exposure to sandblasting was intermittent and brief, and that their distance from sandblasting operations meant that their exposure to silica from sandblasting would be so minute as to be undetectable.

**Verdict**

¶11. The jury found for Reeves. It awarded $149,464.40 in actual economic damages and $1.5 million in noneconomic damages. The jury attributed fifteen percent liability to Valley. The jury also awarded $50,000 in punitive damages. The trial court determined that, since the original action was filed in 2002, Valley was responsible for fifty percent of Reeves's total compensable damages pursuant to Mississippi Code Section 85-5-7(2) (Rev. 2002). The court also found that the $1 million statutory cap on noneconomic damages, enacted in 2004, did not apply to this case. Accordingly, the court ordered Valley to pay half of the roughly $1.65 million verdict, or $824,732.20. Finally the trial court awarded attorney fees and costs to Reeves in the amount of $257,710.50. The total damages assessed to Valley amounted to $1,132,433.70.

¶12. After the plaintiff had presented its case, Valley moved for a directed verdict. After trial, Valley moved for judgment notwithstanding the verdict (JNOV). Both motions were denied. Valley timely perfected its appeal and argues:

I. The trial court erred in denying Valley's motion for JNOV, as the evidence was insufficient to support the jury's verdict.

II. The trial court erred in awarding punitive damages and attorney fees.

8

III.    The trial court erred in awarding damages based upon the law in place in Mississippi in 2002.

IV.    Remittitur should have been granted.

¶13.    Because we hold issue one to be dispositive, our review is limited to the sufficiency-of-the-evidence issue.

STANDARD OF REVIEW

¶14.    When reviewing the denial of a motion for JNOV, this Court will reverse only "[i]f the facts are so overwhelmingly in favor of the appellant that reasonable and fair-minded jurors could not have arrived at a contrary verdict. . . ." *Solanki v. Ervin*, 21 So. 3d 552, 566 (Miss. 2009) (¶ 35) (quotation omitted). Errors of law are reviewed *de novo*. *Madison HMA, Inc. v. St. Dominic-Jackson Mem'l Hosp.*, 35 So. 3d 1209, 1215 (¶ 17) (Miss. 2010).

ANALYSIS

**The trial court erred in denying Valley's motion for JNOV because Reeves adduced insufficient evidence to identify Valley as the source of the sand that killed R.B. as a matter of law.**

¶15.    In any tort case, identifying and proving the source of the harm that proximately caused a plaintiff's injuries is essential. "Recoverable damages mu[st] be reasonably certain in respect to the efficient cause from which they proceed, and the burden is on claimant to show by a preponderance of the evidence *that the person charged was the wrongful author of that cause.*" *Jackson v. Swinney*, 244 Miss. 117, 124, 140 So. 2d 555, 557 (1962) (emphasis added). "The defendant's wrongful conduct must be a cause in fact of plaintiff's injury before there is any liability." *Id.* The plaintiff bears the burden of proof, in a product liability suit, to prove by a preponderance of the evidence that the product which caused the

9

alleged injuries suffered from a defect "at the time the product left the control of the manufacturer or seller. . . ." Miss. Code Ann. § 11-1-63(a) (Rev. 2002). This language clearly indicates that the product must have originated from the manufacturer or seller, and if it did not, then no claim in tort may be sustained. Accordingly, Reeves's burden at trial was to prove that some of the sand that injured R.B. came from Valley.

¶16.    The evidence adduced to show that Valley had supplied sand to Illinois Central was, at best, sparse. Valley argues that R.B. identified Valley sand as the sand that he used on the railroad only after leading questions by his attorney.

> Q:    And did you have a chance to see any of the names that were on the bags that this railroad used that you think you were exposed to?
>
> A:    Yes. I think so. I could.
>
> Q:    Do you remember the names of the bags, the names of the sands or the names that were on the bags of sand that you saw and were exposed to?
>
> A:    All right. Let me get my mind. Clark Valley. Clark Valley or . . .
>
> Q:    Well, let's take the first one.
>
> A:    Clark.
>
> Q:    Let's take Clark.
>
> . . .
>
> Q:    And you mentioned another bag of sand that you used out at the railroad. What was the name of it? *You said Valley*.
>
> A:    Valley. Valley State – wait a minute. State – let's see. Oh, that's a college. Mississippi State.
>
> Q:    What was the name of the sand?
>
> A:    Mississippi State – Mississippi Valley.

10

Q: Mississippi Valley. Okay.

(Emphasis added.)

¶17. R.B. clearly had difficulty remembering the brand of sand that was used by Illinois Central. He specifically remembered using Valley sand on only one occasion, during a flood in Jackson in the 1970s. Further, R.B. never personally loaded the sand into the tanks used for traction sanding. When discussing who had loaded the sand into the tanks, R.B. testified that there was only one instance when he put the sand into such a tank.

Q: Who was responsible for taking the sand and putting it into a tank?

A: Well, that was done in the shops. That's just only one instance that I remember that I put the sand in there.

¶18. Reeves also attempted to connect Valley to the traction sand through the testimony of A.J. Bohannon, R.B.'s longtime locomotive engineer. On direct, Bohannon testified that Valley sand was used as traction sand throughout the 1960s and 1970s to the best of his knowledge. He testified that he knew that Valley sand was used for sandblasting operations in a switching yard in Mobile because he saw it unloaded from boxcars. However, on cross examination, he admitted that he did not recall the name of the sand used for traction.

Q: Mr. Bohannon, do you recall telling me that you did not know the names of any of the sands that would have been used on the tracks? Do you recall that?

A: Well I may not have known them, but I know that we had it shipped in boxcars. And whenever I was in the Mobile yard we had to stop the boxcars up in Frascati shop to be unloaded. And that's whenever they told me [that it was Valley sand].

¶19. No other testimony was adduced regarding Valley's having sold sand specifically to Illinois Central for any purpose, let alone for use as traction sand. No invoices or other

11

relevant records from either Illinois Central or Valley were put into evidence to show how often or how much sand was sold to the railroad by Valley. Reeves offered no witnesses who actually had put sand into Illinois Central locomotives to testify that they used Valley sand. Further, Reeves's industrial hygiene expert, Dr. Rose, determined that R.B. was exposed to silica for more than 1,500 hours. However, no proof was adduced to establish how much of that time he was breathing in Valley sand or Clark sand or anyone else's sand. Dr. Rose's exposure testimony provides no proof that any of the sand of which he spoke had come from Valley. No evidence was adduced which linked *any* sale of Valley sand to Illinois Central.

¶20.   Reeves urges this court to defer to the jury's verdict, arguing that, since there was at least some proof that, at one point, sand from bags labeled Valley was used by Illinois Central, the evidence supports a verdict in which fifteen percent of fault for R.B.'s death is allocated to Valley. Additionally, Reeves argues that Bohannon's statement that Valley sand was used as traction sand throughout the 1960s and 1970s should be given great weight. However, Bohannon admitted that he did not know the name of the sand used for traction braking.

¶21.   We find that Reeves failed to prove that R.B. was exposed to Valley sand for any significant period of time, and that the plaintiff failed to prove that Valley was at fault for R.B.'s injuries as a matter of law. There was no basis for the expert calculations of exposure offered by the plaintiff, as they merely measured total sand exposure and did not establish that the sand inhaled by R.B. was purchased from Valley. This is not a case in which there was a dispute about how much sand Valley had sold to Illinois Central, or for how long. Rather, Reeves failed to show that Valley ever sold sand to Illinois Central, with the possible

12

exception of the single bag of Valley sand which R.B. recalled. Reeves failed to present sufficient evidence from which a jury could make a determination of how much of the sand inhaled by R.B. over his forty-four-year career had come from Valley. Reeves produced sufficient evidence to show that R.B. was exposed to sand, to be sure, but not Valley sand. The product liability statute requires that the plaintiff prove by a preponderance of the evidence that the product in question "left the control of the manufacturer or seller. . . ." Miss. Code Ann. § 11-1-63(a) (Rev. 2002). The dearth of substantive evidence showing that Valley sold any of the sand that made its way in to R.B.'s lungs leads us to conclude that "the facts are so overwhelmingly in favor of the appellant that reasonable and fair-minded jurors could not have arrived at a contrary verdict. . . ." *Solanki*, 21 So. 3d at 566 (¶ 35) (Miss. 2009) (quotation omitted). Because Reeves did not present sufficient evidence to support a finding that Valley caused R.B.'s injuries, we must reverse the judgment of the trial court and render a verdict in favor of Valley.

**CONCLUSION**

¶22.    The plaintiff failed to adduce sufficient evidence from which a jury reasonably could conclude that any appreciable amount of the silica inhaled by Robert B. Reeves over the course of his career was supplied by Valley. His testimony that he had handled one bag of Valley sand in the 1970s, despite his having worked for the railroad for more than forty years, is insufficient to tie Valley to his silicosis. No evidence of invoices or other records detailing sale of Valley sand to Illinois Central was adduced; no testimony by workers who actually filled the sand tanks on the locomotives was forthcoming. Bohannon's testimony that he was told by unknown railyard workers that Valley sand was used on trains does not

13

amount to evidence which we find sufficient to support the jury's verdict. As insufficient proof exists to show that Mississippi Valley Silica sand injured Robert Reeves, the plaintiff's case must fail. Accordingly, we reverse the verdict of the Circuit Court of the Second Judicial District of Jones County and render judgment in favor of the defendant, Mississippi Valley Silica.

¶23.   **REVERSED AND RENDERED.**

**DICKINSON, P.J., LAMAR, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.  WALLER, C.J., AND RANDOLPH, P.J., NOT PARTICIPATING.**